IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHATHAM FINANCIAL CORP.,

    *Plaintiff,*

      v.

                              No. 25-cv-00157-SB

MILHAUS, LLC and PILLAR
MARKETS INC.,

    *Defendants.*

---

Kelly E. Farnan, Sara M. Metzler, RICHARDS, LAYTON & FINGER, PA, Wilmington, Delaware; Tara D. Elliott, LATHAM & WATKINS LLP, Washington, DC.

*Counsel for Plaintiff.*

Andrew Colin Mayo, ASHBY & GEDDES, Wilmington, Delaware; Brian S. Sullivan, Michael A. Xavier, Oleg Khariton, DINSMORE & SHOHL LLP, Cincinnati, OH.

*Counsel for Defendants.*

---

**MEMORANDUM OPINION**

October 28, 2025

BIBAS, *Circuit Judge*, sitting by designation.

Managing debt is complicated, but copying someone else's idea is easy. Chatham Financial poured time and resources into developing a platform for companies with lots of real estate to manage their debts. Milhaus was a one-time customer of Chatham's, but wanted the same product for less. So it colluded with Pillar Markets, a rival of Chatham's, to develop a competing product modeled on Chatham's platform. Chatham sued Milhaus and Pillar for misappropriation of trade secrets and

confidential business information, tortious interference, unfair competition, breach of contract, and violations of the Computer Fraud and Abuse Act. Defendants have moved to dismiss. I partly deny and partly grant the motion.

### I.    MILHAUS & PILLAR USE CHATHAM'S SOFTWARE TO DEVELOP A COMPETING PRODUCT

Chatham is a "global leader in financial risk management services." Compl., D.I. 2, ¶ 12. Among other services, it offers software to "manage … large, diverse asset portfolios while evaluating changing market conditions in real time." *Id.* ¶ 13. One application is ChathamDirect for Debt Management. ChathamDirect is a platform designed to help companies that own lots of real estate manage their documents. *Id.* Those companies upload their loan documents to the platform, which processes and centralizes all the "debt information, giving users a holistic view of their portfolios." *Id.* ChathamDirect also helps its users plan for the future by "model[ing] a variety of budgeting and forecasting scenarios" for their real-estate debt. *Id.*

Milhaus develops mixed-use residential buildings. *Id.* ¶ 18. It subscribed to ChathamDirect in May 2018. *Id.* Chatham and Milhaus signed a contract governing Milhaus's use of the platform. *Id.* The contract barred Milhaus from "access[ing] or us[ing] [the platform] … in order to build a competitive or substitute product or service" or "aid[ing] or permit[ting] any other party" to do so. Chatham-Milhaus Contract, D.I. 8, § 6.2. It also obligated Milhaus to "comply with the restrictions on use for [ChathamDirect] and take reasonable steps to prevent unauthorized use, access, or redistribution of … any of Chatham's intellectual property." *Id.* § 5.1. The initial contract's term was three years; it would then automatically renew every year,

2

unless terminated at will with sixty days' notice. Compl. ¶ 70; Chatham-Milhaus Contract § 4.3.1.

After a few years, Milhaus started thinking that it was paying too much. So it approached Pillar Markets with a business proposition. Pillar had been trying to develop an application creating a "direct marketplace for institutional commercial real estate," but "struggled to find a foothold in the market." Compl. ¶ 29. Sometime in late 2022, Milhaus suggested that Pillar shift its focus away from building a direct marketplace and toward creating a platform to manage portfolios similar to ChathamDirect. *Id.* And Milhaus put its money where its mouth was, offering to partner with Pillar to develop the kind of platform it envisioned. *Id.* ¶ 24. By 2023, Milhaus and Pillar had "formed a joint domain for their competing platform" on Pillar's website. *Id.* ¶ 30.

But the partnership soon grew tense, because Milhaus was "[f]rustrated with [Pillar's] lack of progress" building a ChathamDirect-style product. *Id.* ¶ 32. So it decided to speed things up by letting Pillar's employees use Milhaus's ChathamDirect account. *Id.* That way, Pillar could copy the platform's interface and functions. *Id.* ¶ 33.

In September 2023, Milhaus created a "milhaus.com" email address for a Pillar employee named Kiran Rathni and asked Chatham to give Rathni access to Milhaus's ChathamDirect account. *Id.* ¶ 20. (The parties' contract let Milhaus request login credentials for its "authorized representatives," but also reserved Chatham's right to "refuse access to any individual … designated" by Milhaus. Chatham-Milhaus Contract § 6.1.) With access unlocked, Rathni logged into ChathamDirect roughly 100

times in less than six months. Compl. ¶ 20. He "repeatedly downloaded confidential data and nearly 850 documents and reports" from the platform. *Id.* ¶ 21. Around that time, Milhaus requested a "data dump" of all "confidential data and reports" on ChathamDirect relating to its portfolio, which Chatham gave it in March 2024. *Id.* ¶ 22.

A few days after Chatham sent Milhaus its data, Milhaus notified Chatham that it would terminate the contract. *Id.* ¶ 23. During an "exit interview" with Chatham personnel, two Milhaus employees claimed that the company "had no service or quality issues with [ChathamDirect]" but had "invested in a startup company that would 'directly compete' with Chatham's … platform." *Id.* ¶ 24. They refused to identify the name of the company, but offhandedly referred to "Sanjay," who Chatham soon figured out was Pillar's Chief Investment Officer. *Id.* ¶¶ 24–25.

Chatham quickly sent Milhaus a cease-and-desist letter. *Id.* ¶ 26. In its response, Milhaus admitted that it had "authorized" Pillar to access its ChathamDirect account, acknowledged that it was now a Pillar customer, and confirmed that Pillar's employees had downloaded a "very large volume of documents" from ChathamDirect. *Id.* ¶ 27. Chatham then sent Pillar a cease-and-desist letter. *Id.* ¶ 28. Pillar wrote back, telling Chatham that "at least three additional Pillar employees had shared [Rathni's] credentials to gain access" to the platform after Chatham had granted Rathni access. *Id.*

Chatham responded by suing Milhaus and Pillar. It alleges that both defendants violated the federal Defend Trade Secrets Act (DTSA) and the Computer Fraud and Abuse Act, and that they misappropriated confidential business information. *Id.*

¶¶ 37–53, 90–137. It also asserts unfair-competition and tortious-interference claims against Pillar and a breach-of-contract claim against Milhaus. *Id.* ¶¶ 54–89. Among other remedies, Chatham seeks actual, special, and punitive damages, an accounting and restitution, and injunctive relief. *Id.* at 30–31.

Milhaus and Pillar moved to dismiss for failure to state a claim. D.I. 18; Fed. R. Civ. P. 12(b)(6). In reviewing the motion, I "accept the allegations of the complaint as true and draw all reasonable inferences in the light most favorable" to Chatham. *Bd. of Trs. of Bricklayers & Allied Craftsmen Loc. 6 of N.J. Welfare Fund v. Wettlin Assocs.*, 237 F.3d 270, 272 (3d Cir. 2001).

## II.    CHATHAM STATES A DTSA CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS IN CHATHAMDIRECT'S CUSTOMER-FACING COMPONENTS

Chatham asserts that Milhaus and Pillar misappropriated various trade secrets in ChathamDirect by using their access to the platform to develop a competing product. *See* Compl. ¶¶ 37–47. "To make out a claim under the federal [DTSA], [Chatham] must allege (1) a trade secret (2) connected to interstate commerce (3) that defendants misappropriated." *JPMorgan Chase Bank, Nat'l Ass'n v. Argus Info. & Advisory Servs.*, 765 F. Supp. 3d 367, 374–75 (D. Del. 2025) (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021)). Chatham has satisfied the first two elements and partially satisfied the third. So I let its DTSA claim proceed, but only as far as Chatham asserts trade secrets in ChathamDirect's customer-facing components.

### A. The complaint alleges trade secrets in ChathamDirect

"[I]nformation is a trade secret if (1) its owner 'has taken reasonable measures to keep [it] secret' and (2) its economic value comes partly from the fact that competitors

do not know it." *Id.* at 375 (quoting 18 U.S.C. § 1839(3)). To satisfy Rule 12(b)(6), a plaintiff must identify the alleged trade secrets "with enough specificity to place a defendant on notice of the bases for the claim being made against it." *Oakwood*, 999 F.3d at 906.

Chatham has adequately alleged that it took reasonable measures to keep information relating to its platform secret. The complaint explains that Chatham "limit[s] [ChathamDirect] access to only authorized users … approve[d] in advance," requires username and password credentials, and mandates that its employees and "Chatham customers … sign strict confidentiality agreements." Compl. ¶ 16. Chatham has also alleged that information about the platform derives part of its economic value from the fact that its competitors do not know it. ChathamDirect, it says, is "the industry-leading real estate debt management platform in the U.S. and abroad." *Id.* ¶ 15. If competitors knew and could replicate the platform's design and functionality, Chatham's "competitive edge … would be dulled." *JPMorgan*, 765 F. Supp. 3d at 375.

Finally, Chatham has described the trade secrets specifically enough. Like Janus, computer applications have two faces: an outward-facing interface that customers interact with, and the guts of the application (source code and private algorithms) visible only to the developer. According to the complaint, Chatham's trade secrets in ChathamDirect fall into both buckets.

*1. Chatham has alleged trade secrets in ChathamDirect's front end.* The complaint asserts trade secrets in two outward-facing elements of ChathamDirect: its applications

("centraliz[ing] client's debt information, giving users a holistic view of their portfolios, … allow[ing] users to generate reports on critical loan data terms and calculations, perform[ing] portfolio and loan-level analysis, and model[ing] a variety of budgeting and forecasting scenarios") and its outputs ("the delivery of prompt, reliable, and efficient reports to customers in an easy-to-understand format"). Compl. ¶¶ 14–15.

Courts have sustained DTSA claims arising from similar front-end components of computer applications. In *Deloitte Consulting LLP v. Sagitec Solutions LLC*, for example, the plaintiff asserted trade secrets in the "documents that explain[ed] the process for using [a specific] software, including 'ordered steps a user may execute using [a particular] module or function' or the 'information that will be displayed to the user at each step.'" 2023 WL 6039069, at *1 (D. Del. Sept. 15, 2023) (quoting the complaint). The court declined to dismiss the complaint, reasoning that the plaintiff had "set forth 'reasonably finite' categories of information that put [the defendant] on notice of the claims against it." *Id.* at *3; *see also OWAL, Inc. v. Caregility Corp.*, 2022 WL 890182, at *7 (D.N.J. Mar. 25, 2022) (declining to dismiss DTSA claim asserting trade secrets in, among other things, "website designs").

A competitor need not gain access to the guts of an application to copy its proprietary functionality. That is especially true when the front end is restricted to approved users. *See* Compl. ¶ 40. Here, as in *Deloitte* and *OWAL*, the plaintiff claims protection in an application's specific design and functions. That is enough at this stage. *See You Map, Inc. v. Snap Inc.*, 2021 WL 106498, at *6 (D. Del. Jan. 12, 2021), *report and recommendation adopted*, 2021 WL 327388 (D. Del. Feb. 1, 2021) (noting

that "the visual design or functional aspects of the app's user interface" could constitute a trade secret "if Plaintiff took steps to keep them secret").

2. *Chatham has alleged trade secrets in ChathamDirect's back end.* The complaint also asserts trade secrets in ChathamDirect's "software, architecture, algorithms, and related processes and know-how relating to [the] … platform." Compl. ¶ 15. Again, courts have found allegations of trade secrets in "back-end" elements of computer applications like this sufficient to make out a DTSA claim. The *Deloitte* plaintiff, for example, asserted misappropriation of its "proprietary application software," including "the source code, libraries, configurations, settings, logic, routines, scripts, and database schemas that enable[d] [its computer application] to operate." 2023 WL 6039069, at *1; *see also, e.g.*, *OWAL,* 2022 WL 890182, at *7 (claim arising from misappropriation of "code [and] algorithms and technology"); *You Map*, 2021 WL 106498, at *7 (noting that "source code" and "[s]oftware algorithms" could be trade secrets).

3. *Chatham's description of its trade secrets is clear enough.* Defendants argue that Chatham's description of its trade secrets in ChathamDirect's front and back ends is not specific enough, relying primarily on *Lithero, LLC v. AstraZeneca Pharms. LP*, 2020 WL 4699041, at *2 (D. Del. Aug. 13, 2020); D.I. 25 at 12. But there, the plaintiff could only "point[] to large, general areas of information" about a computer application without specifying what the defendant had misappropriated. *Lithero*, 2020 WL 4699041, at *2. Here, Chatham has described specific elements of ChathamDirect's front and back ends that it asserts are protected trade secrets. *See* Compl. ¶¶ 13–15, 38. Defendants also cite *Vorhees v. Tolia*, where the Third Circuit

8

upheld dismissal of DTSA claims asserting trade secrets in generically described "augmented reality software" without any further detail. 2023 WL 4636738, at *2 (3d Cir. July 20, 2023); *see also* D.I. 25 at 12. For similar reasons, that citation is inapt too. So Chatham has adequately alleged the existence of various trade secrets in ChathamDirect.

### B. The complaint connects Chatham's trade secrets to interstate commerce

The complaint asserts that ChathamDirect's users are scattered around the "U.S. and abroad" and that the platform "services thousands of customers and nets millions of dollars in annual revenue from sales in the U.S. and abroad." Compl. ¶ 15. Those allegations easily satisfy the DTSA's interstate-commerce requirement. *Cf. JPMorgan*, 765 F. Supp. 3d at 375 (finding commerce requirement satisfied where bank "gathered its data from credit cards swiped across the country" and used that data to "make money from coast to coast").

### C. The complaint alleges misappropriation of trade secrets in ChathamDirect's front end, but not its back end

A defendant commits misappropriation "if it (1) use[s] [or discloses] a trade secret of another (2) without express or implied consent and (3) kn[ows] that the trade secret was acquired under circumstances giving rise to a duty to maintain [its] secrecy or limit [its] use." *Id.* at 375 (citing 18 U.S.C. § 1839(5)(B)). A defendant also commits misappropriation if it knowingly "acqui[res] a trade secret of another" through "improper means." 18 U.S.C. § 1839(5)(A). "Improper means" include "misrepresentation." *Id.* § 1835(6)(A).

9

*1. Chatham adequately alleges that Defendants misappropriated trade secrets in ChathamDirect's front end.* Chatham says that Milhaus procured ChathamDirect access for Rathni, a Pillar employee who was working on the development of a competing platform. Compl. ¶ 20. Rathni "accessed Chatham's proprietary … platform approximately 100 times in a span of under six months." *Id.* ¶ 21. Milhaus simultaneously asked Chatham to send it "all confidential data and reports from the … platform that related to Milhaus." *Id.* ¶ 22. And Defendants then collaborated to develop a ChathamDirect copycat. *Id.* ¶ 17.

Those allegations satisfy all the elements of misappropriation. Chatham claims that Milhaus exploited its access to ChathamDirect to develop a competing application with similar functionalities and outputs. *Id.* ¶¶ 22–28. Chatham also claims that it did not consent to that conduct. *Id.* And Chatham says that Milhaus should have known better: The contract Chatham signed with Milhaus prohibited it from using the platform to develop a competing product. *Id.* ¶ 19. As for Pillar, Chatham plausibly alleges that it knew or should have known that it was getting ChathamDirect access through "misrepresentation" given the closeness of the parties' alleged collusion and Milhaus's giving a Pillar employee a misleading Milhaus email address. *Id.* ¶¶ 19–20, 32–33. So the complaint adequately alleges misappropriation of Chatham's trade secrets in ChathamDirect's front end.

Resisting that conclusion, Defendants claim that they downloaded only Milhaus's "own loan documents" and could not misappropriate what was already theirs. D.I. 25 at 14. At the outset, that argument does not address Defendants' alleged misappropriation

of other aspects of ChathamDirect's front end, like its design. Compl. ¶ 15. In any event, Chatham alleges that the documents Defendants downloaded also included "proprietary information." *Id.* ¶ 21. And as Chatham notes, "[d]efendants would have had no reason to download (nearly 850) documents they already possessed." D.I. 26 at 7. So viewing the facts in the light most favorable to Chatham, as I must, the complaint plausibly alleges that Defendants downloaded documents that had either been created or modified by ChathamDirect and contained the front-end trade secrets Chatham argues Defendants misappropriated. *Id.* at 8.

*2. But Chatham does not allege that Defendants misappropriated trade secrets in ChathamDirect's back end.* Recall that Chatham also asserts trade secrets in ChathamDirect's "software, architecture, algorithms, and related process and know-how." Compl. ¶ 15. Defendants argue that Chatham fails to allege that either Pillar or Milhaus "obtained anything beyond subscriber-level access" to the platform. D.I. 25 at 13. And Chatham does not dispute that characterization. D.I. 26 at 7. So the complaint does not allege any "use" or "disclos[ure]," let alone misappropriation, of Chatham's trade secrets in the platform's back end. It fails to state a claim for misappropriation of those sorts of trade secrets. *See You Map*, 2021 WL 106498, at *7 (dismissing DTSA claim arising from misappropriation of back-end code because the complaint failed to "allege facts suggesting that [the] [d]efendants gained access to any source code or algorithm, much less how they did it"). I otherwise allow the DTSA claim to proceed.

## III.    CHATHAM PLEADS SOME STATE-LAW TORT CLAIMS AGAINST DEFENDANTS

Chatham asserts various state-law tort claims against Defendants: a misappropriation of confidential information claim against both defendants and three

tortious-interference claims and an unfair-competition claim against Pillar. Compl. ¶¶ 48–82. I let the misappropriation claim proceed, dismiss the tortious-interference claims, and narrow the unfair-competition claim.

## A. I apply Pennsylvania law

At the outset, Chatham's complaint does not specify the state law under which it asserts its tort claims. Milhaus and Pillar argue that under Delaware's choice-of-law rules, Pennsylvania law applies. *See* D.I. 25 at 15 n.2. Chatham does not dispute that Delaware's choice-of-law rules apply, nor does it offer an alternative source of substantive law. *See* D.I. 26 at 15. Instead, it states that any choice-of-law issues should be resolved later, while citing cases applying Pennsylvania law in support of dismissal. *Id.*

At this stage, there is not enough of a dispute for me to definitively resolve which state's law applies. *Cf. Eagle Force Holdings, LLC v. Campbell*, 2019 WL 4072124, at *13 n.210 (Del. Ch. Aug. 29, 2019), *aff'd in part, rev'd in part on other grounds*, 235 A.3d 727 (Del. 2020) (applying Delaware law at the motion-to-dismiss stage when the briefing relied on it and no party argued that it didn't apply). So I proceed on the assumption that Pennsylvania law applies.

## B. I let Chatham's misappropriation claim proceed against both defendants

Chatham's common-law misappropriation count generally mirrors the DTSA claim, asserting that Milhaus and Pillar used Chatham's confidential information to develop a competitor to ChathamDirect. Compl. ¶¶ 48–53. "Under Pennsylvania law, to state a claim for misappropriation [of confidential information], a plaintiff must allege

([1]) it made a substantial investment of time, effort, and money into creating the thing misappropriated, such that the court can characterize that 'thing' as a property right; (2) the defendant appropriated the 'thing' at little or no cost, such that the defendant reaped what he did not sow; and (3) the defendant injured the plaintiff." *Wurth Baer Supply Co. v. Strouse*, 627 F. Supp. 3d 422, 438 (M.D. Pa. 2022).

Chatham's complaint satisfies all three elements. Chatham asserts that its "in-house experts and software teams have spent nearly two decades building [ChathamDirect] from scratch." Compl. ¶ 14. Chatham also alleges that Milhaus worked with Pillar "to rapidly develop a copy-cat product by studying [ChathamDirect] and downloading vast amounts of data from the … platform over time without authorization." *Id.* ¶ 17. And Chatham claims that Defendants' conduct has "irreparably damaged [it]" because it has "lost business to Pillar's copy-cat platform." *Id.* ¶ 35. Those allegations plausibly state a misappropriation claim.

Pillar and Milhaus complain that the only "confidential" information that they "could have accessed through their user-level access" to ChathamDirect was Milhaus's own files. D.I. 25 at 14. But that argument fails for the same two reasons it failed as to the DTSA claim: First, Chatham has alleged that Defendants misappropriated front-end information *other* than the documents they downloaded, including ChathamDirect's functions and elements of its design. And second, Chatham claims that the documents Pillar downloaded contain information added or created by the platform; to the extent Defendants argue otherwise, that is a factual dispute inappropriate for resolution at this stage. *See supra* Part II.C.

13

Pillar and Milhaus also urge me to treat Chatham's misappropriation claim as a one for the conversion of *trade secrets*. D.I. 25 at 9–10. And, they say, I should dismiss that claim against Pillar because Chatham has failed to allege a confidential relationship between itself and Pillar. *Id.* True, a plaintiff needs to allege the existence of a confidential relationship to bring a common-law conversion of trade secrets claim under Pennsylvania law. *See Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 680 (E.D. Pa. 2018). But that is not the claim Chatham has pled. *See* Compl. ¶ 48; *see also PNC Mortg. v. Superior Mortg. Corp.*, 2012 WL 628000, at *25 (E.D. Pa. Feb. 27, 2012) (noting that "Pennsylvania … recognize[s] that confidential information need not rise to the level of trade secret to be protected" by the misappropriation tort). And misappropriation does not require a confidential relationship. *See Pierre & Carlo, Inc. v. Premier Salons, Inc.*, 713 F. Supp. 2d 471, 381 (E.D. Pa. 2010) ("Pennsylvania recognizes a claim for conversion of business information in accordance with the Restatement of Torts § 759."); Restatement (First) of Torts § 759 (1939) (mentioning no requirement of a relationship between the parties that might give rise to a special duty).

Finally, Defendants ask me to dismiss the misappropriation claim against Milhaus under the gist-of-the-action doctrine, which "precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." *Jones v. ABN Amro Mortg. Group, Inc.*, 606 F.3d 119, 123 (3d Cir. 2010). In Pennsylvania, the gist-of-the-action doctrine bars a tort claim (1) if it "arises solely from a contract between the parties;" (2) if the "duties allegedly breached were created by a contract;" (3) if

"liability is derived from a contract;" or (4) "where the success of the tort claim is dependent on the terms of a contract." *Kia v. Imaging Scis. Int'l, Inc.*, 735 F. Supp. 2d 256, 271 (E.D. Pa. 2010).

That doctrine does not apply here. For starters, the misappropriation claim arises from Chatham's preexisting property rights in the platform rather than rights created by a contract. *See Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 529 (E.D. Pa. 2012); *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 624 (E.D. Pa. 2010).

The duty Chatham alleges Milhaus breached exists independently of any contract, too. True, the Milhaus-Chatham contract imposed on Milhaus a duty not to "access or use [ChathamDirect] … in order to build a competitive or substitute product or service for [the platform] … or … aid or permit any other party to do [so]." Compl. ¶ 19. But that duty was coextensive with Milhaus's preexisting duty not to misappropriate confidential business information. That obligation derives from norms that "businesses will not interfere with each other's confidential information whether bound to each other by contract or not." *Partners Coffee Co. v. Oceana Servs. & Prods. Co.*, 2009 WL 4572911, at *7 (W.D. Pa. Dec. 4, 2009).

Further, Defendants' liability for misappropriation does not turn on the Milhaus-Chatham contract or any other agreement. Indeed, as explained below, the contract Milhaus and Chatham signed expressly *bars* recovery of the sort of damages Chatham seeks here. *See infra* Part IV. Finally, a successful misappropriation claim does not hinge on any term in the Milhaus-Chatham contract. So the gist-of-the-

action doctrine is inapplicable. I will allow Chatham's misappropriation claim to continue against both defendants.

### C. I dismiss Chatham's tortious-interference claims against Pillar

Chatham's tortious-interference counts allege that Pillar: (1) interfered with Chatham's existing economic relationship with Milhaus by causing Milhaus to end their contract; (2) interfered with Chatham's future business relationship with Milhaus; and (3) interfered with the Chatham-Milhaus contract by causing Milhaus to breach its confidentiality provisions. Compl. ¶¶ 61–82. "Under Pennsylvania law, to prevail on a claim for tortious interference with existing or prospective contractual relationships, a party must prove:

(1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party;

(2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant;

(4) legal damage to the plaintiff as a result of the defendant's conduct; and

(5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference."

*Acumed LLC v. Advanced Surgical Servs.*, 561 F.3d 199, 212 (3d Cir. 2009).

*1. All three of Chatham's tortious-interference claims fail because Pillar did not direct any "purposeful action" at Milhaus.* "Purposeful action" is action which "induc[es] or otherwise caus[es] the third person not to perform." *CMPC USA, Inc. v. GWSI, Inc.*, 2024 WL 4655416, at *5 (E.D. Pa. Nov. 1, 2024) (quoting Restatement (Second) of Torts § 766 (1979)). Taking the facts in the complaint as true, Pillar did

not engage in any "purposeful action" to induce Milhaus to terminate its business relationship or breach its contract with Chatham. On the contrary, Chatham's theory of the case is that *Milhaus* affirmatively enlisted *Pillar* to help it develop and migrate to a platform other than ChathamDirect—and was more than happy to breach its contract with Chatham along the way. *See* Compl. ¶ 29. And "Milhaus direct[ed], encouraged, and/or induce[d] Pillar and its employees to access the [ChathamDirect] platform without authorization." *Id.* ¶ 95. Any requests that Pillar made of Milhaus were downstream of Milhaus's original plan to breach. *See id.* ¶ 78. If those allegations are accurate, Pillar did not "cause" Milhaus to do anything it was not already seeking to do. That dooms all three of Chatham's tortious-interference claims. *See Charbonneau v. Chartis Prop. Cas. Co.*, 2015 WL 10793434, at *8 (E.D. Pa. Sept. 21, 2015), *aff'd*, 680 F. App'x 94 (3d Cir. 2017) (rejecting proposition that under Pennsylvania law, "a defendant can be found to have 'induced' breach even where the third party independently intended to breach the contract all along").

2. *Two of Chatham's tortious-interference claims because Pillar did not employ any "wrongful means" against Milhaus.* Chatham's first two tortious-interference claims fail for a second reason. Recall that one of the elements of a tortious-interference claim is "the absence of privilege … on the part of the defendant." *Acumed*, 561 F.3d at 212. One such privilege exists when a third-party entity terminates an at-will contract or declines to enter into a contract with the plaintiff. *Id.* at 215. In those situations, a defendant will not be on the hook for tortious interference unless he used "wrongful means" that caused the entity to end its

17

business relationship with the plaintiff. *See id.* (citing Restatement (Second) of Torts § 768)). "Wrongful means" describes conduct that is "actionable on a basis independent of the interference claim," like "physical violence, fraud, civil suits[,] [or] criminal prosecutions." *Id.* Such conduct needs to be directed at someone other than the plaintiff to give rise to tort liability. *See Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 66 (3d Cir. 1994). But according to the complaint, the only wrongful actions Pillar took were directed at *Chatham*, not Milhaus. That independently tanks Chatham's claims for tortious interference with an existing economic relationship and with prospective business advantage.

### D. I narrow Chatham's unfair-competition claim against Pillar

Chatham's unfair-competition count argues that Pillar (1) wrongly accessed and copied ChathamDirect and (2) improperly caused Milhaus to terminate its business with Chatham. Compl. ¶¶ 54–60. Traditionally, Pennsylvania courts limited the unfair-competition tort to "passing off the goods of one for that of another." *Harbor Bus. Compliance Corp. v. Firstbase.io, Inc.*, 152 F.4th 516, 527 (3d Cir. 2025). But in recent years, they have expanded the tort in the manner contemplated by the Restatement (Third) of Unfair Competition. *See Teva Pharms.*, 291 F. Supp. 3d at 679 (collecting cases). "The Third Circuit has predicted that the Pennsylvania Supreme Court would adopt the Restatement." *Id.* (citing *Acumed*, 561 F.3d at 227 & n.29). According to the Restatement, a defendant is liable for unfair competition if: "(1) he engages in deceptive marketing, infringement of trademark or other protectable intellectual property, misappropriation of trade secrets, … [or] acts or practices that are actionable under federal or state statutes" or common law; and "(2) his conduct causes harm to the plaintiff's

commercial relations." *Id.* (citing Restatement (Third) of Unfair Competition § 1 (1995)).

I have already held that Chatham stated a claim against Pillar for misappropriation of trade secrets under the DTSA and misappropriation of confidential business information under Pennsylvania law. *See supra* Parts II–III.B. Parts of Chatham's unfair-competition claim against Pillar mirror those claims. *See, e.g.*, Compl. ¶ 19. I do not dismiss Chatham's unfair-competition count as far as it attacks the same conduct as those claims, since it arises from "acts or practices that are actionable under federal … statute[]" and Pennsylvania common law. *Teva Pharms.*, 291 F. Supp. 3d at 679.

But Chatham also alleges that Pillar engaged in unfair competition by causing Chatham to "los[e] Milhaus as a customer" and "los[e] revenue from renewal of the parties' [contract] in the future." Compl. ¶ 57. That conduct sounds like tortious interference. And as I have explained, all three of Chatham's tortious-interference claims against Pillar fail as a matter of law. *See supra* Part III.C. In other words, those claims attack conduct that is *not* "actionable" at common law. So Chatham cannot assert an unfair-competition claim based on that conduct either.

### IV. CHATHAM FAILS TO STATE A BREACH-OF-CONTRACT CLAIM

Chatham argues that Milhaus breached the confidentiality provisions of the parties' contract when it "deceptively provid[ed] [ChathamDirect] access to competitor Pillar" and "coordinat[ed] with Pillar to use Chatham's protected … platform as a roadmap for Pillar's copy-cat product." Compl. ¶ 86. The contract is governed by New York law. *See* Chatham-Milhaus Contract § 14.1. In New York, the elements of a breach-of-contract claim are "(1) the existence of an agreement,

(2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). I dismiss Chatham's breach-of-contract claim because the contract bars the type of damages Chatham seeks and equitable relief would be legally impossible.

### A. Chatham seeks consequential damages, which the contract prohibits

New York distinguishes "general" damages from "consequential" damages. General damages "are the natural and probable consequence of the breach of a contract," like "money that the breaching party agreed to pay under the contract." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 680 (N.Y. 2014) (citation omitted). Consequential, or "special" damages, do not "directly flow from the breach." *Id.* Lost profits are usually consequential; they only are general if "the non-breaching party bargained for such profits." *Id.*

Chatham's breach claim alleges only consequential damages. Chatham contends that Milhaus's breach caused it injury in the form of "theft and misappropriation of its intellectual property and confidential information, including Chatham's trade secrets as well as Chatham's confidential data, documents and reports that Milhaus shared with Pillar." Compl. ¶ 87. According to Chatham, the financial *harms* arising from those injuries boil down to "lost business," "lost market share," and "price erosion." *Id.* ¶ 35. Chatham does not assert that Milhaus's breach caused it, for example, to lose out on money it was owed under the contract. *See* D.I. 25 at 19–20. So the damages Chatham asserts are best seen as consequential, not general. *See, e.g.*, *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) ("Lost profits are consequential damages when, as a result of the breach, the non-breaching party

suffers loss of profits on collateral business arrangements."); *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000) (describing damages arising from "the loss of an income-producing asset with an ascertainable market value" as "consequential").

But the parties' contract precludes recovery of "any special, consequential, exemplary, punitive, loss of profits, use or date, or similar damages." Chatham-Milhaus Contract § 9. That clause bars Chatham's breach claim as a matter of law. *See Quality Door & Hardware, Inc. v. Stanley Sec. Sols., Inc.*, 2024 WL 1704714, at *7 (E.D.N.Y. Apr. 19, 2024), *appeal withdrawn*, 2024 WL 5692978 (2d Cir. Aug. 26, 2024).

Chatham does not meaningfully dispute that it seeks only consequential damages. *See* D.I. 26 at 16–17. Instead, it asserts that the second sentence of the limitation-of-liability clause exempts claims arising from "confidentiality breaches." *Id.* at 17. But a close read of the limitation-of-liability clause reveals the truth. The first sentence is a blanket bar on "special, consequential, indirect, exemplary, punitive, loss of profits, use or date, or similar damages." Chatham-Milhaus Contract § 9. The second sentence then places a cap on total recovery: "With the exception of [three scenarios], in no event shall either party be liable … for any amount in excess of the total fees due from [Milhaus] to Chatham pursuant to this [contract]." *Id.* Chatham cherry-picks one of the three exceptions ("confidentiality breaches") but ignores the rest of the sentence. *Id.* Confidentiality breaches are an exception to the limitation on *general* damages "in excess of the total fees due," not an exception to the contract's bar on consequential damages. *Id.*

Chatham also asserts that it has adequately pled damages because the contract lets it seek costs and attorney's fees in cases involving confidentiality breaches. *See*

D.I. 26 at 17 (citing Chatham-Milhaus Contract § 6.3). But "[u]nder New York law, [a] court should not infer a party's intention to provide counsel fees as damages for a breach of contract unless the intention to do so is unmistakably clear from the language of the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) (citations omitted). And here, the contract does not treat attorney's fees as a form of damages. To the contrary, it discusses fees and court costs in a separate paragraph dealing with remedies available for specific categories of breach. *Compare* Chatham-Milhaus Contract § 6.3 (detailing remedies for breach of confidentiality provisions, including injunctive relief and "court costs and reasonable attorneys' fees") *with id.* § 9 (detailing various limitations on damages). Given the lack of clear wording indicating an intent to treat attorney's fees as a form of damages, Chatham cannot "cure its failure to [plead] … damages" by "bootstrapping its request for fees into a showing of damages." *Shred-It USA, Inc. v. Bartscher*, 2005 WL 2367613, at *12 (E.D.N.Y. Sept. 27, 2005).

### B. I cannot enjoin sharing access that Milhaus no longer has

Chatham also asks for a "preliminary and permanent injunction to prevent or restrain further misappropriations, violations[,] and breaches." Compl. 30. Chatham argues that even if the contract bars consequential damages, I should not dismiss the breach claim because it wants equitable relief too. But granting injunctive relief against Milhaus on the breach claim would be a "legal impossibility." *Berenger v. 261 W. LLC*, 93 A.D.3d 175, 185 (N.Y. App. Div. 2012). "Milhaus no longer has any access" to the platform because the parties' contract was terminated "over a year ago." D.I. 30 at 10. So "Milhaus could not be enjoined from 'sharing access' that it does not

have." *Id.* In that circumstance, a "cause of action for an injunction … should … be dismissed." *Berenger*, 93 A.D.3d at 185.

Because Chatham's breach-of-contract count only pleads damages that the contract bars and seeks a pointless injunction, I dismiss the claim in its entirety.

## V.    CHATHAM FAILS TO STATE A CLAIM UNDER THE COMPUTER FRAUD AND ABUSE ACT

Chatham asserts five claims against Defendants under various provisions of the Computer Fraud and Abuse Act: 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), (a)(5)(B–C), (a)(6)(A), and (b). Each claim has slightly different elements. But, broadly speaking, all five all turn on Defendants allegedly accessing Chatham's computer systems without authorization or in a manner exceeding authorized access and getting information from them, conspiring to do so, or improperly sharing passwords. *See generally* Compl. ¶¶ 90–138. While the Act is "primarily a criminal statute," it also contains a private cause of action for "[a]ny person who suffers *damage* or *loss* by reason of a violation" of the Act. *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 507 (3d Cir. 2005) (emphases added); 18 U.S.C. § 1030(g). So any civil claim must plead "damage," "loss," or both. Chatham has pled neither, so I dismiss these claims.

### A. Both "damage" and "loss" require technological harms

The Act defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). It defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or

information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11). Both statutory definitions "focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." *Van Buren v. United States*, 593 U.S. 374, 392 (2021). So to be cognizable under the Act, "losses" need to "relate[] to costs caused by harm to computer data, programs, systems, or information services." *Id.* at 391.

### B. Chatham fails to allege "damage" or "loss"

As a threshold matter, Chatham's complaint asserts that it suffered both "damage" and "loss" from Defendants' violations of the Act, including "the cost of a technological investigation and damage assessment regarding [Defendants'] unauthorized access." Compl. ¶ 97; *see also id.* ¶¶ 109, 113–14, 130, 137. But in opposing Defendants' motion to dismiss, Chatham only challenges the argument that it failed to adequately allege loss. *See* D.I. 26 at 18–19. So I address only the "loss" question.

At first blush, what counts as "loss" is ambiguous. Though *Van Buren* provides some guidance, neither the Supreme Court nor the Third Circuit has parsed the term in detail, and district courts are split on its scope. Some courts take a narrower view, limiting recovery to losses that "arise[] from identifying and remedying 'damage' to the affected computer system." *Socialedge, Inc. v. Traackr, Inc.*, 2024 WL 1533624, at *5 (S.D.N.Y. Apr. 9, 2024) (Engelmayer, J.). In those courts, a plaintiff cannot recover "loss[es]" without showing "damage" of the sort contemplated by the Act—that is, physical "impairment" of the "functioning of the 'target computer itself'" rather than "harm that may have occurred because an unauthorized user obtains or extracts data

24

from the system." *Id.* (citation omitted).

Other courts take a broader view, allowing recovery for "loss[es]" "even in instances in which the violation has not resulted in actual impairment of the protected computer or loss of data." *Ryanair DAC v. Booking Holdings Inc.*, 2024 WL 3732498, at *13 (D. Del. June 17, 2024). But even those courts recognize "limits," because under *Van Buren*, "loss must be focused on technological harm." *Id.* at *14 (citing *Van Buren*, 593 U.S. at 392).

I need not take a position on the split, because either way, Chatham's claims fail. For starters, to the extent Chatham seeks costs arising from "lost business," "lost market share," and "price erosion," those are "business harms" that are not cognizable under either reading of the Act. Compl. ¶ 35; *see Socialedge*, 2024 WL 1533624, at *6 ("Out of bounds are costs of assessing competitive damage to the plaintiff from the misappropriation of its data."); *Ryanair*, 2024 WL 3732498, at *13 (noting that a plaintiff may never recover costs relating to "business harms, such as the costs of investigating how a competitor used protected information"). Chatham cannot use a statute "meant to target hackers" as a backdoor channel to seek damages for competitive injury. *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 590 (E.D. Pa. 2016).

Perhaps aware of the Act's limitations, Chatham also seeks recovery of the "cost[s] of a technological investigation and damage assessment regarding [d]efendants' unauthorized access." *See, e.g.*, Compl. ¶ 97. But there, too, Chatham's claims run into problems. Chatham's investigative costs are not "loss[es]" under the narrow reading of the term because Chatham has not alleged that Defendants' unauthorized access

to ChathamDirect "damaged" its computer systems. *See Socialedge*, 2024 WL 1533624, at *6 ("The bare reference to an investigation, absent allegations that the investigation concerned or uncovered damage to the computer system itself, does not plead a viable … claim" under the Act).

Neither are Chatham's investigative costs cognizable under the broader reading of the Act. Even on that reading, losses must relate to a "technological harm." *See Van Buren*, 593 U.S. at 392. The complaint never alleges that Defendants' access to ChathamDirect caused or even risked causing a technological harm, nor does it specify what Chatham's "technological investigation and damage assessment" sought to accomplish.

To be sure, "technological harm" sweeps more broadly than the "damage" that courts like *Socialedge* require to make out a civil claim under the Act. A bot attack, for example, might not literally corrupt the data in a computer system, but still could cause technological harm in the form of "slowdowns." *Ryanair*, 2024 WL 3732498, at *11; *see also Xfinity Mobile v. Globalgurutech LLC*, 2025 WL 1397110, at *15 (D. Ariz. May 14, 2025) (suggesting that "loss" covers not only lasting harms, such as the "delet[ion] [of] information" or "infect[ion] [of] computers," but also temporary harms like the "crash[ing] [of] networks"). But the broad reading still requires that an investigation be related to *some* technological harm to the plaintiff's computer system. *Cf. Xfinity*, 2025 WL 1397110, at *15 ("Courts have interpreted the definition of 'loss' to make clear Congress's intent to restrict civil actions … to the traditional computer 'hacker' scenario.") (citation omitted). Because the complaint lacks that

crucial detail, all of Chatham's Computer Fraud and Abuse Act claims fall short of what Rule 12(b)(6) requires. So I dismiss them.

* * * * *

Chatham has stated a claim under the federal DTSA, but only for misappropriation of trade secrets in ChathamDirect's front end. Chatham has also stated a common-law misappropriation claim. And it has stated an unfair competition claim to the extent it attacks Defendants' misappropriation of trade secrets and confidential business information. But Chatham has not alleged facts that would make Pillar liable for tortious interference, nor has it alleged facts that would make Milhaus liable for breach of contract. And it has not alleged the sort of "loss[es]" that are cognizable under the Computer Fraud and Abuse Act. So I let Chatham's misappropriation claim proceed, as well as its DTSA and unfair competition claims in narrowed form. I dismiss the rest of Chatham's claims. But I grant Chatham an opportunity to amend its complaint if it so chooses.