IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHATHAM FINANCIAL CORP.,

    *Plaintiff,*

        v.

MILHAUS, LLC and PILLAR
MARKETS INC.,

    *Defendants.*

No. 25-cv-00157-SB

---

Kelly E. Farnan, Sara M. Metzler, RICHARDS, LAYTON & FINGER, PA, Wilmington, DE; Tara D. Elliott, LATHAM & WATKINS LLP, Washington, DC.

*Counsel for Plaintiff.*

Andrew Colin Mayo, John G. Day, ASHBY & GEDDES, Wilmington, DE; Brian S. Sullivan, Michael A. Xavier, Oleg Khariton, DINSMORE & SHOHL LLP, Cincinnati, OH.

*Counsel for Defendants.*

---

### MEMORANDUM OPINION

March 19, 2026

BIBAS, *Circuit Judge*, sitting by designation.

A client can become a competitor in the blink of an eye. Chatham Financial accused a former customer, Milhaus, of colluding with a competing company, Pillar Markets, to poach its trade secrets and confidential business information. It also claimed that Milhaus had breached the parties' contract, and that along the way, both companies had violated the Computer Fraud and Abuse Act (CFAA). I already dismissed parts of Chatham's original complaint, concluding (among other things) that it had failed to

allege cognizable contract damages or cognizable injuries under the CFAA. Now Chatham tries again, repleading its breach-of-contract count and four CFAA counts. It also seeks a declaratory judgment on the scope of a term in its contract with Milhaus. Defendants have once again moved to dismiss. I partly grant and partly deny the motion.

### I.    CHATHAM AMENDS ITS COMPLAINT

Chatham provides "financial risk management services," including a platform called ChathamDirect for Debt Management. *Chatham Fin. Corp. v. Milhaus, LLC*, 807 F. Supp. 3d 373, 381 (D. Del. 2025); Am. Compl, D.I. 50 ¶¶ 12–13. ChathamDirect "help[s] companies that own lots of real estate manage their [financial] documents." *Chatham Fin.*, 807 F. Supp. 3d at 381. Milhaus, a real-estate developer, subscribed to the platform in May 2018. Am. Compl. ¶ 18. Chatham and Milhaus "signed a contract governing Milhaus's use of the platform." *Chatham Fin.*, 807 F. Supp. 3d at 381; *see also* Am. Compl. ¶¶ 18–19. The contract required Milhaus to "comply with [various] restrictions on use for ChathamDirect and take reasonable steps to prevent unauthorized use, access, or redistribution of … Chatham's intellectual property." Chatham-Milhaus Contract, D.I. 51 § 5.1. It also specified that Milhaus would not "contest or dispute the validity of Chatham's intellectual property." *Id.* And it restricted Milhaus's use or disclosure of "confidential information," including "business, financial, marketing, product[,] and technical … information, plans or strategies which are confidential," and ChathamDirect itself. *Id.* § 6.1.

Finally, the contract limited recovery in cases of breach. Specifically, it provided that "[i]n no event shall either party be liable for any special, consequential, indirect, exemplary, punitive, loss of profits, use or date [*sic*], or similar damages." *Id.* § 9. It

also limited any other damages to "the total fees due from [Milhaus] to Chatham pursuant to [the] [a]greement" unless one of three exceptions applied. *Id.* The contract automatically renewed every year following an initial three-year term, but either side could terminate it with sixty days' notice. *Id.* §§ 4.2–4.3. The intellectual-property, confidentiality, and liability-limitation provisions all survived the contract's "termination or expiration." *Id.* § 14.7.

At some point, Milhaus decided it was "paying too much" for ChathamDirect. *Chatham Fin.*, 807 F. Supp. 3d at 381; *see also* Am. Compl. ¶¶ 35–38. So it allegedly colluded with Pillar to develop a similar product. *See* Am. Compl. ¶¶ 35–38. To that end, Milhaus "created a 'milhaus.com' email address for a Pillar employee named Kiran Rathni and asked Chatham to give Rathni access to Milhaus's ChathamDirect account." *Chatham Fin.*, 807 F. Supp. 3d at 382; *see also* Am. Compl. ¶ 25. Once Rathni had access, he allegedly downloaded many documents from the ChathamDirect platform to help model Pillar's product on it. Am. Compl. ¶¶ 26–27.

Milhaus also asked for "a data dump of all confidential data and reports on ChathamDirect relating to its portfolio." *Chatham Fin.*, 807 F. Supp. 3d at 382 (quotations omitted); *see also* Am. Compl. ¶ 27. Milhaus then told Chatham that it planned to end the parties' contract. Am. Compl. ¶ 28. Chatham asked Milhaus why it was leaving. Milhaus responded that it had "invested in a startup company that would directly compete with Chatham[]." *Chatham Fin.*, 807 F. Supp. 3d at 382 (quotation omitted); *see also* Am. Compl. ¶ 29. It also let slip that someone named "Sanjay" was involved with the startup. Am. Compl. ¶ 29. Concerned, Chatham

conducted an internal investigation and learned that "Sanjay" was the Chief Investment Officer of Pillar, and that Rathni, a Pillar employee, had gained user-level access to ChathamDirect with Milhaus's help. *See id.* ¶¶ 30, 34.

Chatham then sued both Milhaus and Pillar, asserting that they had violated the federal Defend Trade Secrets Act (DTSA) and CFAA, and that they had misappropriated confidential business information. *See generally* Compl., D.I. 1, ¶¶ 37–53, 90–137. Chatham also claimed that Pillar had tortiously interfered and engaged in unfair competition, and that Milhaus had breached the parties' contract by violating its intellectual-property and confidential-information provisions. *Id.* ¶¶ 54–89. I dismissed the CFAA, tortious-interference, and breach counts for failing to state a claim. *See Chatham Fin.*, 807 F. Supp. 3d at 393. I also narrowed the DTSA and unfair-competition counts, concluding that Chatham had only alleged misappropriation of its platform's front (or user-facing) end. *See id.*

Chatham amended its complaint. The amended complaint drops the tortious-interference counts and tries to replead the breach-of-contract count against Milhaus, as well as four counts against both defendants under the CFAA. *See* Am. Compl. ¶¶ 73–92, 99–139. It also adds a claim against Milhaus under the Declaratory Judgment Act. *Id.* ¶¶ 93–98. And it reasserts the DTSA and misappropriation claims (against both defendants) and the unfair-competition claim (against Pillar). *Id.* ¶¶ 47–72.

Defendants have moved to dismiss the breach, declaratory judgment, and CFAA counts for failing to state a claim. *See* D.I. 68; Fed. R. Civ. P. 12(b)(6). They have also asked me to "confirm" that Chatham's DTSA, misappropriation, and unfair-

competition claims "can proceed only so far as they implicate Defendants' alleged misappropriation of the front-end, customer-facing aspects" of Chatham's platform. D.I. 69 at 24. In reviewing Defendants' motion, I "accept the allegations of the [amended] complaint as true and draw all reasonable inferences in the light most favorable" to Chatham. *Chatham Fin.*, 807 F. Supp. 3d at 382 (quoting *Bd. of Trs. of Bricklayers & Allied Craftsmen Loc. 6 of N.J. Welfare Fund v. Wettlin Assocs.*, 237 F.3d 270, 272 (3d Cir. 2001)).

## II.    CHATHAM STATES A BREACH-OF-CONTRACT CLAIM

Chatham's contract with Milhaus is governed by New York law. *See* Chatham-Milhaus Contract § 14.1. "In New York, the elements of a breach-of-contract claim are '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Chatham Fin.*, 807 F. Supp. 3d at 390 (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). On the fourth element, New York distinguishes 'general' damages," which are the "natural and probable consequence of the breach of a contract," from "special," or consequential, damages like lost profits. *Id.* (quoting *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 680 (N.Y. 2014)). Typically, general damages are "money that the breaching party agreed to pay under the contract." *Biotronik*, 11 N.E.3d at 680. Consequential damages, on the other hand, are at least "one step removed from the naked performance promised" by the defendant. *PNC Bank, N.A. v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 374 (S.D.N.Y. 2014).

Chatham's original breach-of-contract claim sought various types of consequential damages as well as injunctive relief. *See Chatham Fin.*, 807 F. Supp. 3d at 390. I

5

dismissed it because the parties' contract "preclude[d] recovery of 'any special, consequential, exemplary, punitive, loss of profits, use or date [*sic*], or similar damages,'" and the injunction pointlessly sought to bar Milhaus from sharing access to ChathamDirect that it no longer had. *Id.* at 390–91 (quoting Chatham-Milhaus Contract § 9). Chatham now adds several categories of purportedly general damages, argues that the contract's bar on consequential damages is unenforceable, and, as a last resort, asks for nominal damages. Chatham also renews its request for injunctive relief and seeks restitution for unjust enrichment. I agree with Chatham that New York law limits the reach of the contract's consequential-damages bar. But I conclude that Chatham has failed to plead either general or consequential damages and that it may not seek restitution. So I let the breach-of-contract claim proceed, but only for nominal damages and (potentially) an injunction.

### A. Chatham pleads that a contract existed, that it adequately performed, and that Milhaus breached

As a threshold matter, Chatham adequately pleads the first three elements of a breach claim. The amended complaint specifies that the parties "entered into [an] [a]greement" governing Milhaus's use of ChathamDirect on May 14, 2018. Am. Compl. ¶ 74. It says that "Chatham provided adequate performance of the parties' contract," noting that "[a]fter an initial three-year term, the [a]greement was automatically renewed three times." *Id.* ¶ 76. And it claims that Milhaus breached the contract's confidentiality and intellectual-property provisions by "deceptively providing [ChathamDirect] access to competitor Pillar" and "coordinating with Pillar to use Chatham's protected … platform as a roadmap for Pillar's copy-cat product." *Id.* ¶ 78.

### B. Chatham does not plead general damages

Chatham says that it has incurred four types of supposedly general damages: (1) licensing fees that Milhaus "would have continued to pay Chatham but for its breach"; (2) licensing fees for Milhaus's "prior and ongoing use of the copy-cat … platform"; (3) "costs incurred by Chatham related to setting up and maintaining … Rathni's unauthorized account" and "performing various tasks requested by Milhaus on behalf of … Rathni"; and (4) unspecified "general monetary damages due to Milhaus's continued breach of the surviving provisions of the [a]greement." Am. Compl. ¶¶ 85–88. But none works.

The licensing fees Chatham lost because Milhaus chose not to renew the contract are consequential, not general, damages. The parties' contract was terminable at will with sixty days' notice. *See* Chatham-Milhaus Contract § 4.3.1. No one disputes that Milhaus provided the required notice. So Milhaus did not have to keep using ChathamDirect (or paying Chatham licensing fees) past the end of the contract term. As a result, the hypothetical fees that Chatham says it is owed are "one step removed" from the performance Milhaus promised. *PNC Bank*, 73 F. Supp. 3d at 374. In effect, those fees are lost profits. And lost profits, absent contractual language to the contrary, are consequential damages. *See Chatham Fin.*, 807 F. Supp. 3d at 390.

The licensing fees that Chatham says Milhaus must pay for its "prior and ongoing use of the copy-cat … platform" are not part of the parties' contract at all. Milhaus was to pay Chatham for use of the *ChathamDirect* "[s]oftware" and related "services." Chatham-Milhaus Contract § 1.1; *id.* Sch. A-1 § 1. Nowhere does it mention fees that Milhaus might owe for using a "copy-cat … platform" built using Chatham's

7

intellectual property or trade secrets. In effect, Chatham is attempting to rejigger its federal trade-secrets and common-law tort claims as contract claims. But that would rewrite the parties' contract, and I may not ignore the terms that the parties settled on. *Cf. John Doris, Inc. v. Solomon R. Guggenheim Found.*, 618 N.Y.S.2d 99, 100 (App. Div. 1994) ("[C]ourts may not rewrite the agreement to relieve a sophisticated contracting party from terms that it later deems disadvantageous."). Because the contract does not cover Milhaus's use of a third-party platform, Chatham may not seek general damages arising from that use.

The "costs incurred by Chatham related to setting up and maintaining … Rathni's unauthorized account," for their part, are covered by fees that everyone agrees Milhaus has already paid. The contract's fee schedule expressly states that the licensing fees cover "unlimited user licenses" and "ongoing system maintenance and support." Chatham-Milhaus Contract Sch. A-1 § 1. So any marginal cost of adding Rathni's account is accounted for and covered under the contract. And no one disputes that Milhaus stayed current on its payments through the end of the contract term in 2024. By paying Chatham the fees it owed under the contract, Milhaus "reimbursed [it] for setting up and servicing … Rathni's user account the same way it reimbursed Chatham for setting up and servicing all other Milhaus user accounts." D.I. 69 at 12.

Finally, the amended complaint fails to specify what "general monetary damages" Chatham has suffered because of "Milhaus's continued breach of the surviving provisions of the [contract]." Am. Compl. ¶ 88. An "unsupported claim that [a plaintiff] 'suffered damages,' without any further factual enhancement, is not enough to properly

8

plead the damages element of a breach of contract claim." *Miller v. HSBC Bank U.S.A., N.A.*, 2015 WL 585589, at *4 (S.D.N.Y. Feb. 11, 2015). So I disregard Chatham's conclusory assertion that Milhaus's "continued breach" has caused it general damages.

At bottom, the general damages Chatham says that it incurred are either consequential, not encompassed by the parties' contract, covered by contractual fees that Milhaus already paid, or not specific enough to satisfy Rule 12(b)(6). Chatham has failed to plead general damages.

## C. Chatham does not plead consequential damages either

Perhaps recognizing the weakness of its general-damages claim, Chatham again seeks consequential damages—even though the parties' contract bars them. *See* Chatham-Milhaus Contract § 9. But this time, Chatham has an ace up its sleeve: the allegation that Milhaus's breach amounted to "intentional and willful wrongdoing." Am. Compl. ¶ 89.

Parties are usually bound by the plain terms of an agreement. *See Palmer Plastics v. Rubin*, 108 N.Y.S.2d 514, 518 (Sup. Ct. 1951). But some contractual limitations on liability are unenforceable on public-policy grounds. Parties are typically free to contract to insulate themselves from liability for simple negligence, so long as their agreement to do so is clear. *See Ciofalo v. Vic Tanney Gyms, Inc.*, 177 N.E.2d 925, 926 (N.Y. 1961); *Gross v. Sweet*, 400 N.E.2d 306, 309 (N.Y. 1979). Yet New York courts may decline to enforce limitations on liability where the breaching party's conduct is more culpable. *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983) (citing Restatement (Second) of Contracts § 195 (1981)).

Chatham's allegation of "intentional and willful wrongdoing," implicates New York's public-policy exception. *See* D.I. 70 at 13. Because I am bound by New York law, I conclude that Chatham may seek consequential damages notwithstanding the plain language of the parties' contract. But I also conclude that Chatham has failed to plead consequential damages in its amended complaint.

*1. New York's public policy limits the contract's bar on consequential damages.* New York's highest court has defined the scope of the state's public-policy exception by drawing two lines. The first line is between exculpatory clauses and clauses that merely cap liability. Exculpatory clauses "immunize a party from liability for its own misconduct" or "limit[] damages to a nominal sum." *A.H.A. Gen. Constr. v. New York City Housing Auth.*, 699 N.E.2d 368, 374 (N.Y. 1998) (first quotation); *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1371 (N.Y. 1992) (second quotation). Non-exculpatory liability limitations simply narrow the remedies available for a breach, say by excluding recovery of consequential damages. *See Ambac Assurance Corp. v. Countrywide Home Loans, Inc.* 106 N.E.3d 1176, 1184 (N.Y. 2018). Because exculpatory clauses deprive a non-breaching party of any meaningful recourse, courts are less likely to enforce them. *See Matter of Part 60 Put-Back Litig.*, 165 N.E.3d 180, 187 (N.Y. 2020).

The second line is between cases where a party recklessly or intentionally breaches a contract and cases where a party breaches a contract in a manner that is *independently tortious*. Usually, breaching a contract—even if the breach is reckless or intentional—does not itself create tort liability. *See Teller v. Bill Hayes, Ltd.*, 630

10

N.Y.S.2d 769, 771 (App. Div. 1995). But in cases where a "duty of care [is] breached by the same conduct constituting [a] contractual breach," the breach "gives rise to separate liability in tort … independent of the contract." *Part 60*, 165 N.E.3d at 190. If a breaching party's conduct is independently tortious, a court is less likely to enforce a contractual limitation on liability. *Compare id.* at 191 (enforcing limitation on liability where defendants allegedly breached contracts in grossly negligent manner but did not "violate[] a duty of care separate from their obligations under the contracts"), *with Sommer*, 593 N.E.2d at 1370–71 (refusing to enforce limitation on liability where defendant breached contract while simultaneously violating duty of reasonable care applicable to businesses providing services "affected with a significant public interest"); *see also Coniber v. Hults*, 222 N.Y.S.2d 773, 776 (App. Div. 1962) (noting that in New York, "gross" and "reckless" are "the equivalent of each other in meaning and sense when applied to negligence").

Applying those distinctions, New York's highest court has held that exculpatory clauses are unenforceable any time the breaching party has allegedly acted with gross negligence or worse, even if its conduct is not independently tortious. *See Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 967 N.E.2d 666, 683 (N.Y. 2012) (gross negligence, not independently tortious); *Sommer*, 593 N.E.2d at 554 (gross negligence, independently tortious). The same court has held that a *non*-exculpatory liability limitation remains enforceable when the breaching party was grossly negligent. *See Part 60*, 165 N.E.3d at 183–84. But that court has not yet answered whether non-

exculpatory limitations are enforceable against breaching parties whose breach is independently tortious.

So Chatham's breach claim is not squarely governed by existing New York precedents on the public-policy exception. On the one hand, the contract's liability-limitation provision is not exculpatory. It bars various categories of damages ("special, consequential, indirect, exemplary, punitive, loss of profits, use or date [*sic*], or similar"), but allows general damages up to "the total fees due from [Milhaus] to Chatham pursuant to" the contract, subject to three exceptions. Chatham-Milhaus Contract §9. If one of the exceptions applies, general damages are uncapped. That is a far cry from a clause "purporting to wholly immunize a party from liability." *Part 60,* 165 N.E.3d at 186.

On the other hand, the amended complaint alleges that Milhaus acted tortiously. Recall Chatham's theory of the case: that Milhaus deceptively arranged for a Pillar employee to get access to ChathamDirect so that Pillar could quickly develop a cheaper, competing product based on Chatham's trade secrets and confidential information. If true, those allegations may well amount to intentional torts, as my prior opinion allowing Chatham's trade-secrets and common-law misappropriation claims to proceed explains. *See generally Chatham Fin.*, 807 F. Supp. 3d at 382–89; *Bear, Sterns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 304 (S.D.N.Y. 2005) ("Misappropriation of trade secrets is an independent tort which is not grounded solely in the contractual relationship between the parties, but rather exists independently of the parties' contractual obligations.").

12

As a result, I must make an *Erie* guess: Would New York courts enforce a non-exculpatory liability limitation where the breaching party's conduct is separately an intentional tort? *See generally Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *United States v. Defreitas*, 29 F.4th 135, 143 (3d Cir. 2022) (using term "*Erie* guess"). There are three reasons to think that the answer is no.

*First*, the logic of the public-policy exception suggests applying it whenever a breaching party commits any tort involving culpability beyond simple negligence. The ordinary rule in New York is that "[f]reedom of contract prevails in an arm's length transaction between sophisticated parties." *Part 60*, 165 N.E.3d at 188. The exception recognizes that there are certain "countervailing public policy concerns" that might "reliev[e] [the contracting parties] of the consequences of their bargain." *Id.* Those concerns flow from social norms about how people should interact with one another. Such norms are separate from, and more fundamental than, any obligations imposed by contract. So they can override a contract's clear terms.

That framing explains why exculpatory clauses are unenforceable outside the simple-negligence context. Simple negligence is inadvertent, not intentional. So parties may anticipate and contract around it without immunizing unethical or immoral conduct. More culpable breaches, on the other hand, "smack[] of intentional wrongdoing." *Kalisch-Jarcho*, 448 N.E.2d at 416. And it would "contraven[e] acceptable notions of morality" to "grant immunity" for breaches that are "reckless[ly] indifferen[t] to the rights of others," not to mention breaches that are "fraudulent, malicious[,] or prompted by the sinister intention of one acting in bad faith." *Id.* at

13

416–17. Merely limiting a non-breaching party's remedies does not raise the same concerns, at least where the breaching party's conduct is not independently wrongful. *See Part 60*, 165 N.E.3d at 188.

That framing also suggests that a party may not contractually limit its liability for tortious acts that go beyond mere negligence. "The duties of conduct which give rise to [tort actions] are … based primarily upon social policy, and not necessarily upon the will or intention of the parties." *Victorson v. Bock Laundry Mach. Co.*, 335 N.E.2d 275, 277 (N.Y. 1975). So when a party recklessly or intentionally breaches a contract in a way that is simultaneously tortious, it has run afoul not just of the contract, but also of social norms dictating that a person should not willfully inflict harm on another. *See Carvel Corp. v. Noonan*, 350 F.3d 6, 16–17 (2d Cir. 2003). Letting a party limit its liability for such conduct, no less than letting a party immunize itself entirely, would ignore those norms.

*Second*, the most recent treatment of the public-policy exception by New York's highest court in *Part 60* suggests that the court's reasons for enforcing a contractual liability limitation do not apply where the breaching party has acted tortiously. *Part 60* held that a liability limitation was enforceable where the breaching parties had allegedly acted with gross negligence, but had not committed an independent tort. 165 N.E.3d at 191. But as a partially dissenting judge argued, there were good reasons to think that the defendants *had* acted tortiously. *Id.* at 205–07 (Rivera, J., dissenting in part). Even so, *Part 60* rejected that argument and instead concluded that the "allegations of gross negligence in the complaint related solely to defendants'

14

failure to" adequately perform the contracts at issue. *Id.* at 191 (majority opinion). In other words, the court took pains to limit its reasoning to "cases that … sound purely in breach of contract." *Id.* It "express[ed] no opinion on the scope of the … public policy rule in cases that involve cognizable tort claims or claims that straddle the line between contract and tort." *Id.*

*Third*, a later opinion by New York's intermediate appellate court refused to enforce a contractual "ban on consequential damages" where the plaintiff alleged that the defendant had not only breached the contract but also committed fraud. *IS Chrystie Mgt. LLC v. ADP, LLC*, 168 N.Y.S.3d 449, 451 (App. Div. 2022). The court declined to apply *Part 60*, distinguishing it as a "pure breach of contract case, where a defendant's conduct does not give rise to separate liability in tort." *Id.* (quoting *Part 60*, 165 N.E.3d at 180). True, an intermediate appellate court's opinion on an unresolved matter of state law does not bind me. *See McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662 (3d Cir. 1980) (citing *Comm'r v. Estate of Bosch*, 387 U.S. 456, 471 (1951)). But I must give the opinion "some weight" and follow it unless there is a good reason to go another way. *Id.* There is no such reason here: *IS Chrystie* fits well with the logic of both *Part 60* and the public-policy exception itself.

Defendants say that I should not apply the public-policy exception because two cases "have found similar limitation of liability clauses to be fully enforceable under New York law." D.I. 69 at 15. But they overread those cases. In one case, the defendant breached its contract with the plaintiff in an allegedly "fraudulent, willful[,] or grossly negligent" way. *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 317

15

(S.D.N.Y. 2002). Even so, that district court enforced the contract's bar on "consequential, special or punitive damages," reasoning that "an allegation that a breach of contract was willful rather than involuntary does not allow a court to disregard an unambiguous limitation of liability provision agreed to by parties of equal bargaining power." *Id.* at 318 (citing *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504 (N.Y. 1994)). But *DynCorp* did not involve conduct that was independently tortious. (The plaintiff alleged fraud and negligent misrepresentation as well as breach, but the court dismissed those claims. *See id.* at 329.) *DynCorp* thus applied the same rule that *Part 60* would adopt eighteen years later: that merely alleging a grossly negligent or willful breach cannot get a party out of a liability-limitation clause. So did another case involving only breach claims. *See Optima Media Grp. Ltd. v. Bloomberg L.P.*, 2018 WL 1587074, at *3 (S.D.N.Y. Mar. 28, 2018). That rule provides no insight where, as here, the breaching party's alleged conduct is independently tortious.

Normally, parties should be bound by the terms they choose—especially if they are "sophisticated commercial parties" like Chatham and Milhaus. *Part 60*, 165 N.E.3d at 188. But New York recognizes an exception to that principle grounded in policy concerns. Because I must apply New York law, I conclude that the public-policy exception renders the contract's bar on consequential damages unenforceable given Milhaus's independently tortious conduct. That means Milhaus may not invoke the bar to cap Chatham's recovery of tort damages. It also means that Chatham can—at least theoretically—try to recover consequential damages for Milhaus's breach.

16

*2. But Chatham fails to plead consequential damages.* Even though the contract's consequential-damages bar is unenforceable as to Milhaus's independently tortious conduct, Chatham fails to plead any consequential damages arising from Milhaus's breach. The amended complaint asserts three categories of consequential damages: (1) loss of Milhaus as a customer; (2) loss of additional, unspecified customers; and (3) "lost market share and price erosion" due to "Pillar's competing platform." Am. Compl. ¶¶ 43–44. All three effectively seek the recovery of lost profits. To recover lost profits, a plaintiff must: (1) "demonstrate[] with certainty that such damages [were] caused by the breach"; (2) show that "the alleged loss [is] capable of proof with reasonable certainty"; and (3) show "that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." *Kenford Co.v. Erie Cnty.*, 493 N.E.2d 234, 236 (N.Y. 1986).

The amended complaint flunks the third prong because Chatham does not allege that any of its lost-profits damages were "within the contemplation of the parties … at the time [the contract] was made." *Id.* at 235; *see, e.g.*, *Yenrab, Inc. v. 794 Linden Realty, LLC*, 892 N.Y.S.2d 105, 110 (App. Div. 2009). Nor could it. The parties' contract expressly states that "*in no event* shall either party be liable for any special, consequential … loss of profits … or similar damages." Chatham-Milhaus Contract § 9 (emphasis added). True, that provision is partly unenforceable on public-policy grounds. *See supra* Part II.C.1. But its presence reveals that the parties "had … considered the subject," and that neither of them contemplated that lost-profits damages would be available when they signed the contract. *Kenford*, 493 N.E.2d at 236.

17

Courts have barred consequential damages as a remedy for breach where the parties' contract is silent on the matter. *See Cont'l Info. Sys. Corp. v. Fed. Ins. Co.*, 2003 WL 145561, at *4 (S.D.N.Y. Jan. 17, 2003) (collecting cases). It stands to reason that such damages are unavailable where the parties settle on contract terms that expressly reject them. *Cf. YMCA of Plattsburgh v. Phila. Indem. Ins. Co.*, 2018 WL 6267923, at *6–7 (N.D.N.Y. Nov. 30, 2018) (concluding that the parties did not contemplate that consequential damages would be available, as their contract "stark[ly] limit[ed] … potential recover[y]"). So Chatham has not pleaded any consequential damages that are cognizable under the parties' contract.

### D.  Chatham may seek nominal damages and maybe an injunction

Even though Chatham has not pleaded general or consequential damages, New York law provides that "nominal damages are always available in breach of contract actions." *Ely-Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 987 (N.Y. 1993). Put another way, "[a]lthough 'damages resulting from the breach' is an element of a breach of contract claim … this element may be satisfied by establishing that nominal damages resulted from the breach." *Ferguson v. Ferrante*, 2015 WL 14075030, at *14 (S.D.N.Y. Oct. 8, 2015) (citing *Ely-Cruikshank*, 615 N.E.2d at 987); *see also Narcisse v. Progressive Cas. Ins. Co.*, 778 F. Supp. 3d 597, 610 (S.D.N.Y. 2025) ("The availability of nominal damages … precludes dismissal of [a] breach of contract claim."). The amended complaint, unlike the original complaint, says that Chatham wants nominal damages. *See* Am. Compl. ¶ 92. So I let the repleaded breach claim proceed insofar as it seeks such damages.

Because the request for nominal damages saves Chatham's breach claim, I do not need to resolve whether its renewed request for injunctive relief would independently satisfy the claim's "damage" prong. *Cf. Anedisys, Inc. v. Interim Healthcare of Wichita, Inc.*, 2015 WL 1912308, at *4 n.1 (D. Kan. Apr. 27, 2015) (concluding, under Kansas law, that a "showing of irreparable harm inherently satisfies the damages element of a breach of contract claim"). Instead, I will address whether Chatham is entitled to an injunction if it asks for one down the line.

### E. Chatham may not seek restitution for unjust enrichment

Chatham's repleaded breach of contract claim contains one final allegation: that "Milhaus has unjustly enriched itself through its breaches," entitling Chatham to restitution. Am. Compl. ¶ 90. Not quite. A "theory of unjust enrichment lies as a quasi-contract claim" and contemplates "an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." *Georgia Malone & Co., Inc. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012). "[W]here there is a valid and enforceable contract between the parties, and the subject matter of the unjust enrichment claim is covered by the contract[,] the unjust enrichment claim must be dismissed." *ImagePoint, Inc. v. JPMorgan Chase Bank, N.A.*, 27 F. Supp. 3d 494, 516 (S.D.N.Y. 2014).

Chatham's unjust-enrichment claim rests on Milhaus's alleged breaches of the parties' contract, whose validity neither party contests. *See* Am. Compl. ¶ 90. That does not work: An unjust-enrichment claim that duplicates a breach-of-contract claim is a nonstarter, except in unusual circumstances absent here. *See, e.g., JTH Tax, Inc. v. Gouneh*, 721 F. Supp. 2d 132, 139 (N.D.N.Y.2010) (noting that "unjust enrichment

19

may be pleaded in the alternative to a claim for breach where the existence of a valid agreement is in dispute"). So I dismiss Chatham's breach claim as far as it seeks restitution for unjust enrichment.

* * * * *

Chatham has pleaded the existence of a contract, adequate performance, and a breach by Milhaus, but not general damages arising from that breach. And while the contract's limitation on consequential damages does not bar the door, Chatham has failed to plead such damages. Even so, Chatham may seek nominal damages for Milhaus's breach, and perhaps an injunction. It may not, however, seek restitution for unjust enrichment.

### III.   I DISMISS THE DECLARATORY-JUDGMENT COUNT AS DUPLICATIVE

Separate from the breach-of-contract count, the amended complaint seeks a declaratory judgment that "the … Limitation of Liability clause" in the parties' contract is "unenforceable against Chatham to the extent [that] it excludes recovery for breaches caused by Milhaus's willful and intentional misconduct and reckless disregard for Chatham's rights under the [contract]." Am. Compl. ¶ 98. I dismiss this count as duplicative of the breach claim.

"[T]he decision of whether to resolve cases brought under [the Declaratory Judgment Act] is vested in the Court's discretion." *JJCK, LLC v. Project Lifesaver Int'l*, 2011 WL 2610371, at *5 (D. Del. July 1, 2011); *see also* 28 U.S.C. § 2201 (noting that "any court of the United States … *may* declare the rights and other legal relations of any interested party seeking such declaration") (emphasis added). A court should decline to entertain a declaratory judgment action if the judgment would be

20

of minimal "practical help[] or utility," for example where there is a "'complete identity of factual and legal issues' with another claim being adjudicated by the parties." *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990) (first quotation); *JJCK*, 2011 WL 2610371, at \*6 (*quoting Aldens, Inc. v. Packel*, 524 F.2d 38, 51 (3d Cir. 1975)) (second quotation).

Chatham's declaratory-judgment count "adds nothing to [the] existing lawsuit." *JJCK*, 2011 WL 2610371, at \*6. It simply asks me to resolve a question nested within the breach-of-contract claim. I have already resolved that question by deciding that the contract's liability limitation cannot restrict recovery for reckless or intentional conduct that is independently tortious. *See supra* Part II.C.1. So I dismiss the declaratory-judgment count as duplicative.

## IV.   CHATHAM AGAIN FAILS TO STATE CLAIMS UNDER THE CFAA

The amended complaint tries to replead four of the five CFAA counts that were in the original complaint. *See* Am. Compl. ¶¶ 99–139. Those four counts have "slightly different elements," but generally turn on Defendants "accessing Chatham's computer systems without authorization or in a manner exceeding authorized access and getting information from them, conspiring to do so, or improperly sharing passwords." *Chatham Fin.*, 807 F. Supp. 3d at 391.

I dismissed Chatham's original claims under the CFAA because its civil cause of action requires a plaintiff to have suffered "damage or loss by reason of a violation" of the statute, and Chatham failed to plausibly allege either type of harm. *See id.* at 392–93; 18 U.S.C. § 1030(g). The amended complaint abandons any theory of liability premised on Defendants' causing "damage" to its systems. Instead, it asserts only

21

"losses" incurred from "technological investigations and damage assessments reasonably necessary to respond" to Defendants' misconduct. *Compare* Compl. ¶¶ 97, 109, 113–14, 117, 130, 137, *with* Am. Compl. ¶¶ 106, 118, 131, 138. But the amended complaint fails to plausibly allege that Defendants' actions posed even a risk of technological harm. So Chatham's repleaded claims under the CFAA still fail.

### A.  At minimum, losses must be linked to a risk of technological harm

The CFAA's civil cause of action provides that "[a]ny person who suffers damage or loss by reason of a violation … may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). The CFAA further specifies that a "loss" is "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11).

"[W]hat counts as 'loss' [under the CFAA] is ambiguous." *Chatham Fin.*, 807 F. Supp. 3d at 392. In *Van Buren v. United States*, the Supreme Court provided some guidance, emphasizing that the term "focus[es] on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." 593 U.S. 374, 392 (2021). But beyond that, district courts have split on the term's scope. Some limit recovery to losses that "arise[] from identifying and remedying 'damage' to the affected computer system." *Socialedge, Inc. v. Traackr, Inc.*, 2024 WL 1533624, at *5 (S.D.N.Y. Apr. 9, 2024). Others allow recovery for "loss[es]" "even in instances in which the violation has not resulted in actual

impairment of the protected computer or loss of data." *Ryanair DAC v. Booking Holdings Inc.*, 2024 WL 3732498, at \*13 (D. Del. June 17, 2024).

I previously declined to decide which reading was more faithful to the text and structure of the CFAA, concluding that Chatham's claims failed under either. *See Chatham Fin.*, 807 F. Supp. 3d at 392. This time, Chatham does not even try to argue that its claims satisfy the narrower definition of "loss." *See* D.I. 70 at 23. So I assume without deciding that the broader definition applies.

Though that definition encompasses "the cost[s] of an investigation following a CFAA violation, even in instances in which the violation has not resulted in actual impairment of the protected computer or loss of data," that does not mean that anything goes. *Ryanair*, 2024 WL 3732498, at \*13. Rather, *Van Buren* makes clear that any loss must "*relate[]* to costs caused by harm to computer data, programs, systems, or information services." 593 U.S. at 391 (emphasis added). In other words, any investigation "must be related to the *possibility* of some type" of technological harm, even if the investigation ultimately concludes that no such harm occurred. *CCC Info. Servs., Inc. v. Tractable, Inc.*, 2023 WL 415541, at \*3 (N.D. Ill. Jan. 25, 2023). "Limiting … 'loss' in this way makes sense in a scheme 'aimed at preventing the typical consequences of hacking.'" *ACI Payments, Inc. v. Conservice, LLC*, 2022 WL 622214, at \*11 (D. Utah Mar. 3, 2022) (quoting *Van Buren*, 593 U.S. at 392).

## B. Chatham does not plausibly allege a risk of technological harm

The amended complaint alleges two losses: (1) the costs of an internal investigation that "revealed that Milhaus had deceptively secured login credentials for a Pillar employee"; and (2) the costs of a subsequent "third party" assessment of "the methods

by which the perpetrators gained access [to ChathamDirect] and the extent of the breaches, and the potential impact of those breaches on Chatham's back-end platform." Am. Compl. ¶¶ 31, 34. Chatham says that the amended complaint "includes numerous allegations of suspicious activity that collectively generated sufficient risk of technological impairment to warrant such investigations." D.I. 70 at 24. Not so.

According to the amended complaint, Chatham grew suspicious of Milhaus's intentions after learning that Milhaus had "invested in a startup company" that had "developed a [competing] product." Am. Compl. ¶ 29. By that point, Milhaus had requested a "data dump" of "all confidential data and reports from the … platform that related" to it. *Id.* ¶ 27. But Chatham had no reason to believe that its computer systems had been compromised by that dump, since as the amended complaint acknowledges, Milhaus was entitled to request its data and reports "pursuant to the terms of the [parties'] [a]greement." *Id.*

Even after Chatham figured out that "Milhaus had deceptively secured login credentials" for Rathni, that only indicated that someone had engaged in a "customary, but perhaps unauthorized, use of the database." *Id.* ¶ 31 (first quotation); *CoStar Grp., Inc. v. Leon Cap. Grp., LLC*, 2023 WL 5133182, at *5 (D.D.C. Aug. 10, 2023) (second quotation). The mere fact that Rathni had gotten front-end access did not give Chatham any reason to suspect that someone had "altered the data, corrupted any files, diminished the … performance [of its systems], or restricted access to the [systems] for other users." *CoStar*, 2023 WL 5133182, at *5. To the

24

contrary, all signs suggested that Rathni had "the [same] kind of access enjoyed by all of the other users of [ChathamDirect]." D.I. 69 at 23.

To be sure, the amended complaint also asserts that Chatham suspected that Pillar's breaches involved "circumvention of security controls," "anomalies related to … logins," and "further suspicious activity." Am. Compl. ¶ 34. But it never provides a plausible basis for those suspicions. Because they are conclusory and unsupported by the factual allegations in the complaint, I do not assume that they are true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

At bottom, and taking the well-pleaded allegations in the amended complaint as true, none of Defendants' alleged misconduct posed a risk of technological harm that could have made Chatham's investigative costs recoverable "losses" under the CFAA. I again reject Chatham's attempt to use a statute "meant to target hackers" as a "backdoor channel" to seek damages for conduct well beyond the statute's ambit. *Chatham Fin.*, 807 F. Supp. 3d at 393 (quoting *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 590 (E.D. Pa. 2016)). So I dismiss all four of its CFAA claims, this time with prejudice. In my prior opinion, I put Chatham on notice that it needed to plead facts giving rise to a plausible inference that Defendants' "access to ChathamDirect caused or … risked causing a technological harm." *Chatham Fin.*, 807 F. Supp. 3d at 393. But the amended complaint contains no such facts. Instead, Chatham has stuck with the same losing theory: that the CFAA lets it seek damages for investigative costs unrelated to hacking. In that circumstance, further amendment would be futile.

*See Hall v. City of Wilmington*, 2009 WL 971473, at \*2 (D. Del. Apr. 7, 2009), *report and recommendation adopted*, 2009 WL 1530837 (D. Del. May 28, 2009).

### V.    CHATHAM'S DTSA, COMMON-LAW MISAPPROPRIATION, AND UNFAIR-COMPETITION CLAIMS MAY PROCEED AS PREVIOUSLY NARROWED

The amended complaint repleads three counts that I already let proceed: (1) misappropriation of trade secrets under the DTSA; (2) common-law misappropriation of confidential information; and (3) common-law unfair competition. *See* Am. Compl. ¶¶ 47–72; *Chatham Fin.*, 807 F. Supp. 3d at 393. But I previously narrowed the DTSA claim, emphasizing that Chatham had alleged misappropriation of trade secrets only in ChathamDirect's front end. *See Chatham Fin.*, 807 F. Supp. 3d at 384–85. I narrowed the unfair-competition claim too, limiting it to the same conduct that Chatham attacked in its trade-secrets and common-law misappropriation claims. *See id.* at 389.

Even so, Chatham has not removed the allegation that its trade secrets include "software, architecture, algorithms, and related processes and know-how relating to [ChathamDirect]." Am. Compl. ¶ 15. That allegation remains conclusory: The amended complaint, like the original one, fails to "allege any 'use' or 'disclos[ure],' let alone misappropriation, of Chatham's trade secrets in the platform's back end." *Chatham Fin.*, 807 F. Supp. 3d at 385. Since use or disclosure is an essential element of a trade-secrets claim, I again dismiss the DTSA claim's assertion of trade secrets in ChathamDirect's back end. And I let the unfair competition claim proceed, as I did previously, only so far as it "attacks the same conduct as [the DTSA and common-law misappropriation] claims." *Id.* at 389.

26

* * * * *

Chatham has stated a breach-of-contract claim against Milhaus, but only as far as it seeks nominal damages (and potentially an injunction). Chatham's request for a declaratory judgment that the contract's liability-limitation provision is unenforceable is duplicative of Chatham's breach claim, so I dismiss it. I also dismiss all four CFAA claims—this time with prejudice—because Chatham again fails to allege cognizable "loss[es]." I let Chatham's DTSA, misappropriation of confidential business information, and unfair-competition claims go forward as narrowed in my previous order partially dismissing Chatham's original complaint.